AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California

FILED

MAR 21 2018

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

(1) One iPhone 7s Cellular Phone, IMEI: 356572082525112.

Case No.

## 18MJ1326

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated herein)

located in the _____ Southern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. Sec. 1324 | Bringing in and Harboring Certain Aliens |

The application is based on these facts:

See attached Affidavit (incorporated herein)

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Linnet Edasi; CBP Enforcement Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/21/18

*Judge's signature*

City and state: San Diego, California

Hon. Bernard G. Skomal, U.S. Magistrate Judge
*Printed name and title*

1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15

| IN THE MATTER OF THE SEARCH OF<br><br>(1) One iPhone 7s Cellular Phone, IMEI: 356572082525112. | **AFFIDAVIT OF OFFICER LINNET EDASI IN SUPPORT OF WARRANT TO SEARCH CELLULAR TELEPHONE** |
|---|---|

16      I, Officer Linnet Edasi, having been duly sworn, declare and state as follows:

17                                    **I**

18                         **INTRODUCTION**

19      1.      I make this affidavit in support of an application for a warrant to search an

20  iPhone 7s cellular phone, IMEI: 356572082525112 (the "Target Device"), and seize

21  evidence of crimes, specifically violations of Title 8, United States Code, Section 1324,

22  Bringing in and Harboring Certain Aliens (the "Target Offenses").

23      2.      The Target Device was seized from Defendant Brittney Elizabeth Rangel

24  ("Defendant") at the time of her arrest for Bringing in Unlawful Aliens for Financial Gain

25  on January 14, 2018, at the San Ysidro, California Port of Entry.  The Target Device is

26  currently in the possession of United States Customs and Border Protection ("CBP") as

27  evidence and being held at 9495 Customshouse Plaza, San Diego, California 92154.

28

3.     This search of the Target Device supports an investigation and prosecution of Defendant for the Target Offenses.  Based on the information below, there is probable cause to believe that a search of the Target Device, as described in Attachment A, will produce evidence of the Target Offenses, as described in Attachment B.

4.     The following is based upon my experience and training, investigation, and consultation with other law enforcement agents and officers experienced in narcotics and immigration violations, including the Target Offenses.  The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case.  Because I make this affidavit for the limited purpose of obtaining a search warrant for the Target Device, it does not contain all of the information known by me or other federal agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause.  Dates and times are approximate, and refer to Pacific Standard Time (PST) unless otherwise specified.

## II

## AFFIANT'S EXPERIENCE AND TRAINING

5.     I have been employed as a CBP Enforcement Officer since June 2003.  I am currently assigned to the San Ysidro, California Port of Entry.  My responsibilities include investigating crimes that are committed at the Port of Entry, including attempted illegal re-entry (8 U.S.C. § 1326); alien smuggling (8 U.S.C. § 1324), and importation of controlled substances (21 U.S.C. § 952).  I have received specialized Immigrations and Customs training, including interview techniques, processing expedited removals, and the issuance of immigration documents.

6.     I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure.  I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants.  I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

7.    As a CBP Enforcement Officer, I have investigated a number of cases involving aliens illegally attempting to enter and/or illegally entering the United States. The investigations into these cases have included the issuance of arrest warrants, search warrants, seizure warrants, and/or indictments. These investigations have focused on the individuals attempting to enter the United States illegally and the drivers and guides who assist them.

8.    I have investigated cases involving in the illegal entry of unlawful aliens into the United States, the smuggling of unlawful aliens into the United States, the transportation and harboring of unlawful aliens within the United States and the utilization of illegally obtained, counterfeit, or altered immigration documents to gain entry into the United States. I have also interviewed defendants and witnesses regarding their involvement in alien smuggling offenses.

9.    Through my observations, training, and these interviews, I have gained a working knowledge and insight into the normal operational habits of alien smugglers, with particular emphasis on those who attempt to smuggle unlawful aliens into the United States from Mexico at the San Diego international ports of entry.

10.    Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. Typically, load drivers smuggling aliens across the border from Mexico into the United States are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver their human cargo. Alien smugglers and their organizations use cellular/mobile telephones, in part, because these individuals believe law enforcement is unable to track the phone numbers of calls placed to and from cellular/mobile telephones.

11.     Based upon my training and experience as a CBP Enforcement Officer, and consultations with law enforcement officers, I submit the following:

a.     Alien smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, email, Internet, social media applications, and text and voice messages.

b.     Alien smugglers will use cellular telephones because they are able to monitor the progress of their illegal cargo while the conveyance is in transit.

c.     Alien smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations within the United States.

d.     Alien smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e.     Alien smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity, including the presence and location of marked and unmarked units, as well as the operational status of Border Patrol checkpoints or Ports of Entry within the United States.

f.     Alien smugglers will often use cellular phones and smart devices to guide illegal aliens who are crossing into the United States, providing them instructions as to where to go and what to do during a smuggling event.  This is often done from over watch positions on high ground in Mexico or at the border fence.  This allows smugglers to remotely control the actions of the smuggled aliens, while insulating themselves from criminal prosecution.

g.     Conspiracies involving alien smuggling often generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, and phone numbers of co-conspirators.

11.     Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers.  Such data

includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

12.     Based upon my training and experience as a CBP Enforcement Officer, and consultations with law enforcement officers experienced in smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, based upon my training and education, I have learned that searches of cellular/mobile telephones associated with smuggling investigations yield evidence:

     a.    tending to identify attempts to smuggle aliens from Mexico into the United States;

     b.    tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the smuggling of aliens from Mexico into the United States;

     c.    tending to identify co-conspirators, criminal associates, or others involved in the smuggling of aliens from Mexico into the United States;

     d.    tending to identify travel to or presence at locations involved in the smuggling aliens from Mexico into the United States, such as stash houses, load houses, or delivery points;

     e.    tending to identify the user of, or persons with control over or access to, cellular/mobile telephone(s); and/or

    f.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III

## STATEMENT OF PROBABLE CAUSE

12.    On January 14, 2018, at approximately 3:06 a.m., Defendant applied for entry to the United States at the San Ysidro, California Port of Entry. Defendant was the driver, sole visible occupant, and registered owner of a white 2014 Volkswagen Jetta bearing California license plates 7ZVE891 (the "Vehicle"). Defendant approached the primary inspection area via a vehicle lane designated for Secure Electronic Network for Travelers Rapid Inspection ("SENTRI") cardholders. SENTRI is a program that permits certain travelers to submit to go through an expedited inspection process after undergoing an extensive background screening.

13.    CBP Officer Passariello was working the primary inspection booth during this time. Defendant presented her SENTRI card to Officer Passariello and told him she was travelling to San Diego, California. Defendant also confirmed that she was the owner of the Vehicle and she had nothing to declare from Mexico. Officer Passariello asked Defendant to open the Vehicle's trunk and then Officer Williams inspected the trunk. Upon looking inside the Vehicle's trunk, Officer Williams discovered a person hiding inside and closed the trunk again. Officers then escorted Defendant to the security office and took the Vehicle to secondary inspection.

14.    Moments later, in the secondary inspection area, CBP officers opened the Vehicle's trunk and removed two males. These males were later identified as (1) Jose Guadalupe Cervantes-Garcia, and (2) Jose de Jesus Cuellar-Hernandez (collectively, the "Material Witnesses"). Both of these individuals were determined to be citizens of Mexico with no legal right to enter or remain in the United States.

15.    CBP Officer Guzman advised Defendant of her *Miranda* rights and then conducted a post-arrest interview. Defendant told Officer Guzman that she has owned the

1  2014 Volkswagen Jetta for about four months. Defendant further stated she is a certified
2  medical assistant, but she is currently unemployed and receiving unemployment.

3       16.    Defendant said she had been at dinner with her family earlier in the evening
4  on the day of her arrest. While at dinner, her ex-boyfriend, Gerardo Medina, contacted her
5  via the WhatsApp application. Defendant claims she had told Medina that she wanted to
6  get the Vehicle detailed and Medina said he could arrange for someone to do it. Defendant
7  stated an unknown male came and retrieved the Vehicle's keys from her and took the car
8  to detail it.

9       17.    Defendant said she later went to Club 54 in Tijuana, which is in the same area
10  where she had been having dinner. While at Club 54, Medina contacted her and she met
11  the man who detailed her car for her. She said she paid him $40.00 for his work, and
12  opened the trunk to ensure none of her personal items were missing. She then returned to
13  Club 54 with her friends.

14       18.    Defendant claimed she later left Club 54 with her two friends, Jenny and
15  David. Defendant said she dropped Jenny and David off at two different locations before
16  she went to the border. Defendant denied knowledge of the people in her trunk.

17       19.    The Material witnesses were interviewed at Port of Entry and again in the
18  United States Attorney's Office on March 8, 2018. During this interview, both Material
19  Witnesses indicated they traveled from Jalisco to Tijuana for the express purpose of
20  entering the United States. Upon arriving in Tijuana, a female known only as "La Guerra"
21  met them at the airport and took them to a hotel. They remained at the hotel together for
22  approximately eight days. On the evening of the eighth day, La Guerra told them to get
23  ready and sent a taxi to pick them up. The taxi drove them to a warehouse where they met
24  two unidentified males (the "UMs"). The UMs left them alone at the warehouse and then
25  returned and drove them to a parking structure where they climbed into the Vehicle's trunk.
26  Both Material Witnesses said the UMs appeared to know exactly where to go in the parking
27  structure to find the Vehicle (i.e., they drove directly to the Vehicle and did not drive
28  around the parking lot as if they were searching for it).

20.    Both Material Witnesses also stated the UMs told them precisely what would happen once they climbed in the trunk.  Specifically, they were told that three people would get in the Vehicle, and they should be quiet because one of the three people would not know they were in the trunk.  The person who did not know they would be in the trunk would get dropped off before they reached the border.  One of the material witnesses, Cuellar, also said that the UMs told him that the person driving the Vehicle was a "sure thing" because she had a special visa that kept her from getting searched at the Port of Entry.  Neither of the Material Witnesses ever saw the Vehicle's driver and were unable to identify her.

21.    Based on my experience investigating alien smugglers, Defendant may have used the Target Device to coordinate with her co-conspirators regarding when they would bring the Material Witnesses to her Vehicle, the location of the Vehicle, and where she would go once the Material Witnesses were in the Vehicle's trunk.  This appears to be the most likely explanation for how the UMs could have known (1) where Defendant's Vehicle was parked, (2) that Defendant was a SENTRI card holder, and (3) how many people would get into Defendant's Vehicle when she left Club 54.

22.    Based on my experience and training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I further believe that information relevant to the alien smuggling activities and her co-conspirators, such as recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites, pictures, and other digital information may be stored in the memory of the Target Device and may identify other persons involved in alien smuggling activities.

23.    Alien smuggling conspiracies require intricate planning and coordination.  This often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States.  Co-conspirators communicate with one another in efforts to ensure success in getting their valuable cargo to its destination within the United States.  Given

1  this, I request permission to search the Target Device for items listed in Attachment B
2  beginning on October 14, 2017, up to and including January 14, 2018.

### III

### METHODOLOGY

5      24.    It is not possible to determine, merely by knowing the cellular telephone's
6  make, model and serial number, the nature and types of services to which the device is
7  subscribed and the nature of the data stored on the device. Cellular devices today can be
8  simple cellular telephones and text message devices, can include cameras, can serve as
9  personal digital assistants and have functions such as calendars and full address books and
10  can be mini-computers allowing for electronic mail services, web services and rudimentary
11  word processing. An increasing number of cellular service providers now allow for their
12  subscribers to access their device over the internet and remotely destroy all of the data
13  contained on the device. For that reason, the device may only be powered in a secure
14  environment or, if possible, started in "flight mode," which disables access to the network.
15  Unlike typical computers, many cellular telephones do not have hard drives or hard drive
16  equivalents and store information in volatile memory within the device or in memory cards
17  inserted into the device. Current technology provides some solutions for acquiring some
18  of the data stored in some cellular telephone models using forensic hardware and software.
19  Even if some of the stored information on the device may be acquired forensically, not all
20  of the data subject to seizure may be so acquired. For devices that are not subject to
21  forensic data acquisition or that have potentially relevant data stored that is not subject to
22  such acquisition, the examiner must inspect the device manually and record the process
23  and the results using digital photography. This process is time and labor intensive and may
24  take weeks or longer.

25      25.    Following the issuance of this warrant, I will collect the Target Device and
26  subject it to analysis. All forensic analysis of the data contained within the Target Device
27  and its memory cards will employ search protocols directed exclusively to the
28  identification and extraction of data within the scope of this warrant.

26.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months.   The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

# IV

## **CONCLUSION**

27.    Based on all of the facts and circumstances described above, my training and experience, and consultations with other law enforcement officers, there is probable cause to conclude that Defendant utilized the Target Device to facilitate the smuggling of unlawful aliens in violation of Title 8, United States Code, Section 1324 and Title 18, United States Code, Section 371.

28.    Because the Target Device was promptly seized during the investigation of Defendant's smuggling activities and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by Defendant continues to exist on the Target Device.  As stated above, I believe that the date range for this search is from October 14, 2017 through January 14, 2018.

//
//
//
//
//
//
//
//
//
//
//
//

1        29.    Based upon my experience and training, consultation with other agents in

2  narcotics investigations, consultation with other sources of information, and the facts set forth

3  herein, I believe that the items to be seized set forth in Attachment B (incorporated herein) are

4  likely to be found in the property to be searched described in Attachment A (incorporated

5  herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, or

6  another federal law enforcement agent specially trained in digital evidence recovery, to search

7  the items described in Attachment A, and seize the items listed in Attachment B.

8        I declare under penalty of perjury that the foregoing is true and correct.

10  Linnet Edasi
11  Enforcement Officer
12  Customs and Border Protection

14  Sworn to and subscribed before me this ____21____ day of March, 2018.

16
17  HONORABLE BERNARD G. SKOMAL
     UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violation of Title 8, United States Code, Section 1324 (Bringing in and Harboring Certain Aliens) is an iPhone 7s cellular phone, IMEI: 356572082525112 (the "Target Device").

The Target Device is currently in the possession of the United States Customs and Border Protection as evidence and being held at 9495 Customshouse Plaza, San Diego, California 92154.

# **ATTACHMENT B**

Authorization to search the Target Device described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Device for evidence described below. The seizure and search of the Target Device shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of October 14, 2017 to January 14, 2018:

a.   tending to identify attempts to smuggle aliens from Mexico into the United States;

b.   tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the smuggling of aliens from Mexico into the United States;

c.   tending to identify co-conspirators, criminal associates, or others involved in the smuggling of aliens from Mexico into the United States;

d.   tending to identify travel to or presence at locations involved in the smuggling aliens from Mexico into the United States, such as stash houses, load houses, or delivery points;

e.   tending to identify the user of, or persons with control over or access to, cellular/mobile telephone(s); and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of Title 8, United States Code, Section 1324.